IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GENERAL MOTORS LLC,

       Plaintiff,

                           CIVIL ACTION NO.

v.                       1:12-cv-01994-JEC

CANTON MOTOR SALES, INC. d/b/a
MOORE PONTIAC BUICK GMC TRUCK
and SHOTTENKIRK AUTOMOTIVE,
INC.,

       Defendants.

---

SHOTTENKIRK AUTOMOTIVE, INC.
and CANTON MOTOR SALES, INC.
d/b/a MOORE BUICK GMC,

       Plaintiffs,

                           CIVIL ACTION NO.

v.                       1:12-cv-02201-JEC

GENERAL MOTORS LLC,

       Defendant.

## ORDER & OPINION

This case is before the Court on defendant General Motors LLC's ("GM") and plaintiff Shottenkirk Automotive, Inc.'s ("Shottenkirk") opposing Motions for Summary Judgment. (Case No. 2201, [48], [51].) The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that GM's Motion for Summary Judgment (Case No. 2201, [48]) should be **GRANTED** and Shottenkirk's Motion for Summary Judgment (Case No. 2201, [51])

should be **DENIED**.

**BACKGROUND**

This case arises out of GM's refusal to approve an Asset Purchase Agreement between Shottenkirk and co-plaintiff Canton Motor Sales, Inc. ("Canton"). GM claims that the proposed Asset Purchase Agreement conflicts with a prior Settlement Agreement with Canton that it seeks to enforce. Some background information is necessary.

In 2008, GM successfully sought financial assistance from the United States government because of a severe liquidity crisis that threatened its operations--and, consequently, its suppliers--and that had potential ripple effects across the entire domestic automotive industry. *In re Gen. Motors Corp.*, 407 B.R. 463, 476-77 (S.D.N.Y. 2009). In connection with receipt of these federal funds, GM filed for bankruptcy on June 1, 2009 in order to complete a Treasury-sponsored sale of its assets under § 363 of the Bankruptcy Code (the "Bankruptcy Sale"). *Id.* at 479-80. As part of this Bankruptcy Sale, the bankruptcy court permitted GM to restructure its dealer network in order to make itself more competitive. *Id.* at 475-76; (Notice of Removal with Compl., Case No. 2201, [1] at Ex. 1, ¶ JJ). Through this restructuring, GM identified Canton as an underperforming dealership, but rather than immediately terminating it, offered Canton a wind-down agreement. (Hudgens Decl., attached to Def. GM's Mot. for Summ. J., Case No. 2201 ("Hudgens Decl."), [48] at ¶ 6.)

2

Canton accepted the wind-down agreement and returned it to GM in June of 2009. ((Filed Under Seal) Unredacted Compl., Case No. 1994, [11] at Ex. 2.)

The bankruptcy court found GM's wind-down agreements with its dealers to be valid and enforceable contracts, but this turned out not to be the last word on the subject. Instead, Congress intervened on behalf of dealerships that were being "wound-down" by passing, in late 2009, the Consolidated Appropriations Act. (Notice of Removal with Compl., Case No. 2201, [1] at Ex. 1, ¶ 31); Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034 (2009). Pertinent to the pending litigation is § 747 of that legislation, which granted to dealerships that had accepted wind-down agreements the right, through binding arbitration, to seek reinstatement in GM's franchise network. *Id.* at § 747(b) ("§ 747").

Canton initially elected to arbitrate its claim for reinstatement, but prior to arbitration, GM and Canton entered into an "Option Agreement to Resolve Pending Arbitration" (the "Settlement Agreement") on May 19, 2010. ((Filed Under Seal) Unredacted Compl., Case No. 1994, [11] at Ex. 3.) This Settlement Agreement reinstated Canton, but imposed performance terms: that is, the contract was expressly conditioned, among other things, on Canton achieving an aggregate Retail Sales Index ("Sales Index") score of 85 for the period of January 1, 2011 to December 31, 2011. Under the Settlement

3

Agreement, a failure to do so constituted a breach of the Settlement Agreement. (*Id*. at ¶¶ 1(g), 12, 13.) In the event of a breach, GM reserved the option to purchase Canton's customer lists, business records, goodwill, and intangible assets for $134,986 (the "Option"). (*Id*. at ¶ 15, Ex. C.)

GM and Canton operated under the Settlement Agreement for a little over a year when, in August of 2011, Canton contemplated selling its franchise. (Weaver Decl., attached to Def. GM's Reply Br. to Pl. Shottenkirk's Mot. for Summ. J., Case No. 2201 ("Weaver Decl."), [57] at ¶ 7.) On August 26, 2011 Canton's owners, Jack and Eugene Moore, met with two GM representatives to discuss the possibility of a franchise transfer.[1] (Canton's Statement of Additional Material Facts, Case No. 2201, [56] at ¶ 8; Weaver Decl. [57] at ¶ 7.)

Canton found a potential transferee in Shottenkirk, one of the parties in this litigation, and, in April 2012 the two entities entered into a proposed Asset Purchase Agreement (the "Purchase Agreement"). Under the terms of this agreement, Shottenkirk agreed to purchase Canton's assets, goodwill, and all contracts, leases, and

---

[1]    Canton maintains that GM employees represented to it that GM should or would approve a sale of Canton's dealership--despite its inadequate Sales Index scores--if a suitable purchaser was found. (Pl. Canton's Resp. to Def. GM's Mot. for Summ. J., Case No. 2201, [54] at 2-3, Moore Aff. at ¶¶ 9, 11-12, 18-19,  28.)

agreements for $3.2 million.   (Purchase Agreement, Case No. 2201, [69] at ¶ 1.1.10; Moore Aff., attached to Pl. Canton's Resp. Br. to Def. GM's Mot. For Summ. J., Case No. 2201 ("Moore Aff."), [54] at ¶ 20.)   Canton forwarded the Purchase Agreement to GM on April 12, 2012.[2]  (Canton's Statement of Additional Material Facts, Case No. 2201, [56] at ¶ 19.)

On April 13, 2012 Jack Moore spoke with Jeff Moore--a GM employee, who was no relation--who confirmed that GM received a copy of the Purchase Agreement.  (Moore Aff. [54] at ¶ 22.)  On April 16, 2012, Jack Moore had a subsequent conversation with Valerie Weaver, another GM employee, in which Weaver told Moore that she forwarded the Purchase Agreement to David Herc, a GM representative in Detroit.  (*Id.* at ¶¶ 24-25.)  Anxious to complete the sale, Jack Moore spoke with Herc on April 17, 2012.  (*Id.* at ¶ 26.)  Herc informed Moore that he had forwarded the Purchase Agreement to "GM Legal" for "review and approval" and that Moore should receive a response within a week to ten days.  (*Id.* at ¶ 27.)

When Moore had not heard from GM for "several weeks," he again

---

[2]     Canton claims that once it identified Shottenkirk as a purchaser and entered into the Purchase Agreement with it, GM employees commented that Shottenkirk's qualifications as a buyer were excellent and assured Canton that GM would or should approve the proposed sale of its dealership to Shottenkirk.  (Pl. Canton's Resp. to Def. GM's Mot. for Summ. J., Case No. 2201, [54] at at 4-5, Moore Aff. at ¶¶ 21-27.)

contacted the company.[3]  (*Id.* at ¶¶ 29-30.)  GM agreed to speak with Canton, and the parties met on June 5, 2012.  At that time, GM presented Canton with a letter informing Canton that, because it had failed to meet its performance requirements, GM was exercising its option to purchase all of Canton's assets.  In short, GM was terminating Canton's dealership.  (Moore Aff. at ¶¶ 31-32; GM's Statement of Material Facts, attached to Def. GM's Mot. For Summ. J., Case No. 2201, [48] at ¶ 31); ((Filed Under Seal) Unredacted Compl., Case No. 1994, [11] at Ex. 5.)

Three days after the meeting, on June 8, 2012, GM filed suit in this Court against Shottenkirk and Canton seeking enforcement of the Settlement Agreement and recovery for tortious interference with contract and business opportunity.  (Compl., Case No. 1994, [1].) Approximately ten days later, Shottenkirk filed a complaint against GM and Canton in the Cherokee County, Georgia Superior Court to enforce its Purchase Agreement with Canton.  (Notice of Removal and Compl., Case No. 2201, [1].)  GM removed Shottenkirk's suit on the bases of diversity and federal question jurisdiction (*id.* at 5-12), and the case was ultimately assigned to the undersigned.  (Order,

---

[3]   Although Moore claims that he had not heard from GM for several weeks, GM hand-delivered a letter to Canton on May 29, 2012 in which it acknowledged receiving the Purchase Agreement and restated its obligations under the Settlement Agreement.  (Hudgens Decl. [46] at Ex. 2.)

Case No. 2201, [4].)

Shottenkirk moved for remand to state court on the grounds of lack of diversity and lack of a federal question:  a motion this Court denied because it realigned Canton as a plaintiff and accordingly found diversity of citizenship to exist.  (Order & Opinion, Case No. 2201, [35] at 7-13.)  Finally, after finding significant overlap of parties, material facts, and legal issues, this Court granted GM's motion to consolidate the two lawsuits on November 27, 2012.  (*Id.* at 14-16.)

Presently before the Court are two motions:  (1) GM's Motion for Summary Judgment on Counts I-IV of its own Complaint, on Counts I-IV of its Counterclaims and Crossclaims in Answer to Shottenkirk's Complaint, and on Counts I-IV of Shottenkirk's Complaint and (2) Shottenkirk's Motion for Summary Judgment on all claims.  (Case No. 2201, [48]; Case No. 2201, [51].)  Reference to the count numbers of a particular claim is, however, very confusing as there are three complaints filed in two cases: two by GM in the case it filed,12-cv-1994, and one by Shottenkirk in its case, 12-cv-2201.  In addition, GM has filed counterclaims and crossclaims in its Answer in the No. 2201 action that mimic the claims it has made in its own amended complaint in the No. 1994 action.

Accordingly, a reference to a claim by its count number almost requires a flow chart.  To simplify matters, one can characterize

7

GM's complaint as consisting of two basic claims: a claim against Canton for breach of contract and a claim against Shottenkirk for tortious interference with GM's contractual and business relationship with Canton. GM has broken down its breach of contract claim into a legal claim for a contractual breach by Canton and for a declaratory judgment that GM is right in its contentions, as well as equitable claims seeking specific performance and an injunction. Shottenkirk essentially seeks summary judgment in its favor as to all of GM's claims, including GM's tortious interference claim directed only against Shottenkirk.

Shottenkirk's complaint contains no tortious interference claim, but otherwise it is the flip-side of GM's complaint. That is, it argues that a declaratory judgment affirming the correctness of its positions (and the incorrectness of GM's) should be issued and that Canton should be permitted to consummate its sale of its dealership to Shottenkirk. GM does <u>not</u> seek a summary judgment as to its tortious interference claims against Shottenkirk, but it does seek a summary judgment against Shottenkirk as to all other claims made by the latter.

**DISCUSSION**

I.    **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file,

8

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non[-]moving party's case necessarily renders all other facts immaterial. *Id.* at 322-23 (quoting FED. R. CIV. P. 56(c)).

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323. However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely "'showing'--that is, pointing out to the

district court--that there is an absence of evidence to support the non-moving party's case." *Id*. at 325.  After the movant has carried his burden, the non-moving party is then required to "go beyond the pleading" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id*. at 324.  While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-48 (1986).

II.  **WHETHER THE GM-CANTON SETTLEMENT AGREEMENT IS ENFORCEABLE**

    A.  **Parties' Positions**

    The dispositive question in this case is whether the Settlement Agreement between GM and Canton is enforceable.  If it is, its terms vindicate GM's refusal to accede to the Purchase Agreement between Canton and Shottenkirk.  That is, the Settlement Agreement clearly provides that, should Canton not meet its performance goals within the designated period of time, GM would be empowered both to reject any request by Canton to transfer its dealership to another entity and to exercise its own option to purchase Canton's assets.  As Canton does not dispute its failure to meet these performance

10

requirements, the Settlement Agreement permitted GM to do exactly what it did here: decline Canton's request to transfer the dealership to a potential purchaser (Shottenkirk) and thereby necessarily preclude Shottenkirk from enforcing its Purchase Agreement with Canton.

Not surprisingly, GM makes this very argument.  The wrinkle in the case is the existence of the Georgia Motor Vehicle Franchise Practices Act ("Georgia statute"), O.C.G.A. § 10-1-620 *et seq.*  That statute governs certain aspects of the relationship between an automobile dealership (here, Canton) and its national franchisor (here, GM).  Shottenkirk[4] argues that while GM's conduct may have

---

[4]  In its response to GM's motion for summary judgment, Canton has done little more than adopt Shottenkirk's response and ask for more time for discovery.  (*See* Canton's Resp. to Def. GM's Mot. for Summ. J., Case No. 2201, [54] at 5-8.)  As to the latter, Canton has offered no hint of what discovery it seeks to pursue.  Indeed, GM notes that Canton had made no effort to pursue discovery.  *See Ashmore v. Sec'y, Dep't of Transp.*, 503 Fed. App'x 683, 686 (11th Cir. 2013)(affirming denial of Rule 56(d) motion to defer summary judgment ruling pending discovery, where party failed to conduct discovery before filing motion to extend deadline); *NCI Grp., Inc. v. Cannon Servs., Inc.*, Civil Action No. 1:09-CV-0441-RWS, 2011 WL 5599127, at *7-8 (N.D. Ga. Nov. 16, 2011)(Story, J.)(denying Rule 56(d) motion because party failed to identify facts that it sought to discover).

Further, Canton's request contradicts its own acquiescence to the parties' joint motion to stay discovery, which states that the parties agree there are questions of law that may dispose of the claims, that the parties have already engaged in "substantial written discovery" and have agreed to complete any outstanding requests, and that a stay of discovery is in the best interests of the parties. (Case No. 2201, [59] at ¶¶ 3-5.)  The Court agrees that, as to GM's

complied with the terms of the Settlement Agreement between GM and
Canton, this conduct ran afoul of the Georgia statute that governs,
both substantively and procedurally, a franchisor's right to refuse
a dealer's request to transfer his dealership to another entity:
O.C.G.A. § 10-1-653 (1999).[5]

> Section 10-1-653 provides in pertinent part:

> If a...dealer desires to make a change in...ownership or to
> sell its principal assets, [it] will give the franchisor
> prior written notice of the proposed change or sale.  The
> franchisor shall not arbitrarily refuse to agree to such
> proposed change or sale...unless the franchisor can prove
> that its decision is not arbitrary and that the
> new...owner...is unfit or unqualified to be a dealer based
> on the franchisor's prior written, reasonable, objective,
> and uniformly applied...standards....Where the franchisor
> rejects a proposed change or sale, the franchisor shall
> give written notice of his reasons to the [dealer] within
> 60 days.  If no such notice is give to the [dealer], the
> change or sale shall be deemed approved.

(emphasis added).   In other words, to comply with the above
statute, a franchisor is prohibited from rejecting a dealer's

---

breach of contract claim against Canton, there is no reason to delay
a ruling for unspecified discovery that Canton might take.

   [5] Actually, Shottenkirk's argument is much less straightforward
than the above description.  That is, as GM notes, Shottenkirk never
disputes GM's assertion that the Settlement Agreement is enforceable
against Canton.  Instead, Shottenkirk argues that it is a party
protected by the statute, that it is not subject to the Settlement
Agreement, and that GM's actions violated the Georgia statute and
injured Shottenkirk.   It is a confusing argument, but before
addressing it, the Court will first examine whether the Settlement
Agreement between GM and Canton--and GM's acts in compliance with
that contract--contravenes the Georgia Motor Vehicle Franchise
Practices Act.

proposal to sell unless the franchisor can demonstrate both that its decision is not arbitrary and that the potential purchaser is unqualified.  Thus, should § 653, alone, govern here, then GM would lose because the proposed new owner, Shottenkirk, was eminently qualified to take over the dealership.  Specifically, Shottenkirk, which had agreed to pay Canton $3.2 million for the transfer, is owned by an experienced automotive dealer, Greg Shottenkirk, who has twenty years experience in the field, presently owns and operates four other GM dealerships across the county, and has a "strong financial position and continued track record of success."  (Pl. Shottenkirk's Mem. Support Mot. Summ. J., Case No. 2201, [51-1] at 2 n.1.)  Indeed, GM does not dispute that Shottenkirk is qualified to be a dealer.

But the question whether the Georgia statute trumps the Settlement Agreement gives rise to a more fundamental question: what law controls here?  To that question, the Court next turns.

### B.   **Choice of Law Question**

#### 1.   Potential Sources of Legal Authority

The parties engage in little, if any, discussion of choice of law principles or how the latter might impact the resolution of this case.  Nonetheless, there are three sources of law that could potentially affect resolution of the issues in this case: (1) Michigan law, as the Settlement Agreement provides that it should be

13

controlled by Michigan law; (2) federal law, given the fact that the original wind-down agreement signed by Canton was done as part of GM's restructuring in its bankruptcy proceeding; and (3) Georgia law, as this action was filed in Georgia and as Shottenkirk and Canton rely on a Georgia statute in their efforts to defeat enforcement of the Settlement Agreement.

As to the first potential source of legal authority, the Settlement Agreement provides that: "This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan." (Option Agreement to Resolve Pending Arbitration ("Settlement Agreement"), Case No. 2201, [69] Ex. 3 at ¶ 23.) GM contends that Michigan law applies here, while Shottenkirk contends that it does not. (*Compare* GM's Mot. for Summ. J., Case No. 2201, [48] at 18 (Michigan law applies) *with* Shottenkirk's Resp., Case No. 2201, [49] at 7 and n.4 (Michigan law does not apply).) Notwithstanding this assertion, GM barely mentions Michigan law in the several pleadings it has filed. Indeed, as it never indicates what Michigan law would say about this specific issue or how it would differ from Georgia law, GM's observation that Michigan law controls is not very helpful.

Second, and alternatively, GM argues that federal law controls here and preempts any contrary state statute; Shottenkirk disagrees. The federal law that GM is referencing is the order by the Southern

14

District of New York Bankruptcy Court in the GM bankruptcy proceeding, permitting wind-down agreements with dealerships, notwithstanding the fact that these agreements might be inconsistent with state statutes that effectively prohibit the terms under which wind-downs would be occurring.  GM states that this "federal law" preempts contrary state law.

Third, Shottenkirk argues that Georgia law--and, in particular, the Georgia Motor Vehicle Franchise Practices Act, O.C.G.A. § 653-- controls.  As set out above, § 653 would require GM, a franchisor, to permit Canton, a dealer, to sell its dealership unless GM could prove that the potential purchaser was not qualified to be a dealer, which GM cannot do in this case.

2.   Whether Federal Law Preempts Georgia Law Here

GM assumes, without explanation or discussion, that federal law preempts any contrary Georgia law.  Without expending too much of the undersigned's own time fleshing out an argument that counsel should have explained, some basic understanding of preemption principles is necessary.  As a general matter, federal law can preempt state law under three circumstances: (1) when Congress expressly states that it is doing so; (2) when Congress has preempted the "field" at issue by so comprehensively legislating in the area that it has left no room for supplementary state regulations; and (3) when there is a conflict between state and federal regulations such that compliance with both

15

is a physical impossibility and/or state law stands as an obstacle to the accomplishment of the full objectives of Congress. *Arizona v. United States*, 567 U.S.---, 132 S. Ct. 2492, 2500-01 (2012); *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S.---, 132 S. Ct. 1261, 1265-66 (2012).

GM appears to be relying on only the third basis for federal preemption: a conflict between federal and state law. Yet, GM does not identify with which federal law § 653 of the Georgia statute conflicts. Presumably, GM is arguing that the Bankruptcy Court's order permitting GM to enter into wind-down agreements with its dealers supercedes any state laws that might not permit such agreements. Indeed, GM cites to the order of the GM Bankruptcy Court, which stated that federal bankruptcy law permitted a debtor in reorganization, such as GM, to shed undesirable contracts with dealers, notwithstanding contrary state law that would forbid this action. The Bankruptcy Court noted that its authority to order such relief for a debtor derived from the Supremacy Clause and the Bankruptcy Clause of the Constitution, and thereby preempted contrary state law. *See In re Gen. Motors Corp.*, 407 B.R. at 515-516.

The Court will assume that the Bankruptcy Court's reasoning is correct, but even were it not, it would not matter because the wind-down agreement between GM and Canton is not at issue here. Events overtook the relevance of that agreement when Congress enacted a

16

statute permitting a dealer to arbitrate a decision by GM to wind

down the dealership.  Canton took advantage of that opportunity, and

its settlement agreement with GM represents the parties' decision on

that matter.  Accordingly, GM has not explained why federal law would

control, nor identified what that federal law is.

> 3.   Whether Georgia Law or Michigan Law Controls Here

As noted, the Settlement Agreement between GM and Canton

provides that Michigan law governs the agreement, but Shottenkirk[6]

---

[6] GM argues that Canton has not opposed its motion for summary judgment and, accordingly, that summary judgment should be granted against it as being unopposed, pursuant to Local Rule 7.1(B).  In fact, Canton filed a response in which it adopted Shottenkirk's response in opposition to GM's motion for summary judgment.  (*See* Pl. Canton's Resp. to Def. GM's Mot. for Summ. J., Case No. 2201, [54] at 5-8.)  In addition, Canton also argued that GM cannot rely on the Settlement Agreement because of the latter's unclean hands, fraud, and deceitful conduct.  (*Id.* at 6.)

It is true that Canton does not provide its own defense as to GM's contractual argument in support of enforcement of the Settlement Agreement and that its reliance on Shottenkirk's contentions in that regard is incomplete, as part of Shottenkirk's argument is that even if the Settlement Agreement is enforceable against GM, it is not enforceable against Shottenkirk.  Local Rule 7.1(B) states that "[f]ailure to file a response [opposing a motion] shall indicate that there is no opposition to the motion." LR 7.1(B), NDGa.  Canton did file a response here, however.

Moreover, summary judgment cannot be granted simply by default, but must be granted based upon the merits of the motion. *U.S. v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004).  Thus, the granting of a motion because it is unopposed is not automatic merely because the defendant failed to file a response; rather, it "lies within the discretion of the district judge" after review of the evidentiary materials. *Magluta v. Samples*, 162 F.3d 662, 664-65 (11th Cir. 1998); *Sherk v.*

AO 72A
(Rev.8/82)

nonetheless argues that Georgia law should apply. Albeit consideration of that contention requires a determination of the effect of the agreement's choice of law provision, the parties do not formally discuss choice of law principles in their briefing. Again, the Court will briefly endeavor to do so itself.

Because this Court's power to handle this case arises out of its diversity jurisdiction, it must apply Georgia's conflict of laws rules in deciding which state's law controls. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008). For contract claims, Georgia applies the "*lex loci contractus* rule, which provides that when a contract is made and to be performed in one state, its validity, nature, construction, and interpretation are governed by the substantive law of that state." *Farm Credit of Nw. Florida, ACA v. Easom Peanut Co.,* 312 Ga. App. 374, 381 (2011).

There is no need to determine here, however, in which state the Settlement Agreement between GM and Canton was to be performed-- whether that be Georgia or Michigan--because the settlement agreement specifies that Michigan law will govern interpretation of the contract. And, with two exceptions, Georgia law recognizes the

---

*Adesa Atlanta, LLC*, 432 F. Supp. 2d 1358, 1374 (N.D. Ga. 2006)(Camp, J.).

AO 72A
(Rev.8/82)

parties' right to stipulate that the laws of another jurisdiction will govern the transaction. *Rayle Tech, Inc. v. DeKalb Swine Breeders, Inc.*, 133 F.3d 1405, 1409 (11th Cir. 1998).  As to those two exceptions, Georgia law will not follow the law of the state stipulated to by the parties (1) if that state has no substantial relationship to the parties or the transaction at issue or (2) if that state's law is contrary to Georgia public policy.  *Id; CS-Lakeview at Gwinnett, Inc. v. Simon Prop. Grp., Inc.*, 283 Ga. App. 686, 688 (2007)("Absent a contrary public policy, this court will normally enforce a contractual choice of law clause.").

Clearly, the stipulated state, Michigan, has a substantial relationship to the parties and the transaction at issue, so Michigan law will apply unless it contravenes Georgia public policy.  Of course, it is very difficult to say whether Michigan law would violate Georgia public policy because, as noted, GM never states what the Michigan law in question is.  Presumably, it would allow for enforcement of the Settlement Agreement, as Shottenkirk opposes use of that law and as GM favors it.  Stated another way, Shottenkirk appears to recognize that the Settlement Agreement will be enforceable (1) unless it violates Georgia law, as embodied in the Georgia Motor Vehicle Franchise Practices Act and (2) unless enforcement of a contract that violates this statute would violate Georgia public policy.

19

Because the Court concludes that the Settlement Agreement does not violate the Georgia Motor Vehicle Franchise Practices Act, it does not have to reach the question whether enforcement of a contract that violates this statute would contravene Georgia public policy.

**C.    The Settlement Agreement Does Not Violate The Georgia Motor Vehicle Franchise Practices Act**

Shottenkirk focuses exclusively on only one section of the Georgia statute: O.C.G.A. § 10-1-653.  As explained above, that section requires a franchisor to agree to a dealer's request to transfer ownership of a dealership to another entity, unless the franchisor can prove that the new owner would not be qualified or fit to run a dealership.  *Supra*, at 11-13.  Were this the only relevant part of the statute, it would be clear that GM has violated the Georgia law.  But there is another section of the statute, largely ignored by Shottenkirk, that is not only pertinent, but dispositive.

Section 10-1-627 provides that a franchisor cannot nullify any of the provisions of the Act by a written agreement, <u>but</u> goes on to note that this section does not prohibit a dealer from voluntarily entering into a valid release agreement "to resolve a specific claim, dispute, or action" between the franchisor and dealer.[7]  The same or

---

[7]    § 10-1-627 provides:

No franchisor, nor any agent nor employee of a franchisor, shall use a written instrument, agreement, or waiver to attempt to nullify any of the provisions of this article

20

similar release language also appears in § 10-1-623(d)(permitting a party injured by a violation of the Act to sue, <u>but</u> permitting a release agreement to resolve a specific claim, dispute, or action between the franchisor and the dealer) and § 10-1-662(a)(6) (describing, as an unlawful act by a franchisor, the latter's requirement that a dealer prospectively release the franchisor from any liability for violation of the Act, <u>but</u> permitting a dealer to enter into a valid release agreement with the franchisor).

In short, the Georgia statute upon which Shottenkirk's claims are founded permits a dealer to voluntarily enter into a release agreement to settle a dispute with the franchisor. Under Georgia law, a "release or settlement agreement is a contract subject to construction by the court." *Kobatake v. E.I. DuPont De Nemours & Co.*, 162 F.3d 619, 624 (11th Cir. 1998)(quoting *Darby v. Mathis*, 212 Ga. App. 444, 444 (1994)). When reviewing contracts, the Court's first duty is to determine whether the contractual language is clear

---

and any such agreement, written instrument, or waiver shall be null and void. <u>This code section shall not prevent a dealer from voluntarily entering into a valid release agreement to resolve a specific claim, dispute, or action between the franchisor and the dealer</u> **or** <u>when separate and adequate consideration is offered and accepted</u>, provided that the renewal of a franchise shall not by itself constitute separate and adequate consideration.

O.C.G.A § 10-1-627 (2010)(emphasis added).

and unambiguous. *Gen. Steel, Inc. v. Delta Bldg. Sys., Inc.*, 297 Ga. App. 136, 138 (2009)(describing the construction of contracts). A contract is ambiguous where the language leaves the intent of the parties "uncertain, unclear, or [] open to various interpretations." *Id*. at 138. A contract is unambiguous where there is only one reasonable interpretation when affording the contract's words their plain and ordinary meaning. *Id.* If the contract is plain and unambiguous, no construction is required and the court "simply enforces the contract according to its clear terms." *Id.* at 138.

Further, in Georgia, it is "well settled that [the] law favors compromises, and an agreement to settle a pending lawsuit should be enforced according to its terms." *McClain v. George*, 267 Ga. App. 851, 854 (2004)(citing *Smith v. Haverty Furniture Co.*, 173 Ga. App. 447, 448 (1985)). Indeed, "when parties have entered into a definite, certain, and unambiguous agreement to settle, it should be enforced". *Clough Mktg. Servs., Inc. v. Main Line Corp.*, 313 Fed. App'x 208, 211 (11th Cir. 2008)(quoting *Ruskin v. AAF-McQuay, Inc.*, 284 Ga. App. 49, 51-52 (2007)).

The Settlement Agreement at issue here is clear and unambiguous, and served to resolve an ongoing dispute between the parties. The parties agreed that it--along with the wind-down agreement and the subsequent amendment to the wind-down agreement--represented their complete understanding. ((Filed Under Seal) Unredacted Compl., Case

22

No. 1994, [11] at Ex. 3, ¶ 25.)  The Settlement Agreement states that the parties executed it in order to settle the pending § 747 arbitration and as a release of all claims.  It further outlines, with specificity, the rights and remedies of the parties.  (*See, e.g., id.* at ¶¶ A, 1(g), 5-6, 12-15, 17-18.)  In this release, Canton affirms that it had reviewed the contract with its legal advisors and that it signed the document voluntarily and without mental, physical, or economic distress.  (*Id.* at ¶ 21.)  As such, this Court finds that the Settlement Agreement is clearly and unambiguously a release for purposes of the Georgia statute, and it is due to be enforced according to its clear terms.

Notwithstanding the clear applicability of the above contract law principles here to require enforcement of the Settlement Agreement, Shottenkirk argues that the Settlement Agreement is unenforceable in this case.  Shottenkirk contends that, to be valid under the statute, a release must settle a dispute arising under the Act.  Instead, Shottenkirk argues, the Settlement Agreement settled a dispute arising in connection with the § 747 arbitration proceeding.  (Pl. Shottenkirk's Resp. Br. to Def. GM's Mot. for Summ. J., Case No. 2201, [49] at 8.)

This argument is unpersuasive.  Nothing in the Motor Vehicle Franchise Protection Act indicates that a release agreement must settle a dispute under that Act.  The Act permits release agreements

23

"to resolve a specific claim, dispute, or action between the franchisor and the dealer"; it does not qualify this language by requiring disputes to arise under the Act. *See, e.g.*, O.C.G.A. § 10-1-627. Where a statute's text is plain and unambiguous, the Court "must apply the statute according to its terms." *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009).

Here, there was obviously a dispute between the parties. After issuance of the Bankruptcy Court Order permitting GM to terminate dealerships that it deemed to be unproductive, GM had notified Canton that it would be one of those terminated dealerships. Thereafter, Canton had signed a wind-down agreement with GM that would have required it to shutter its operations within a specified and relatively short period of time. Congress then came to the rescue with some potential relief: the opportunity for a terminated dealership to arbitrate GM"s decision according to factors set out in the legislation.

Canton took advantage of this opportunity to arbitrate and filed a claim. Prior to resolution of this claim, Canton agreed to dismiss the arbitration claim in return for the concessions offered to it by GM in the Settlement Agreement: specifically, Canton would be given a specified period of time to meet certain performance goals. If it did not meet those goals, however, GM would have the right to terminate Canton as a dealer and to purchase its assets for an

24

agreed-upon price.

Clearly the two parties had a dispute and Canton had filed a claim before the arbitration panel. The Settlement Agreement resolved this dispute by giving Canton something it wanted: more time to perform in a manner that would allow its franchise to continue operations. Perhaps, Canton could have won its arbitration and obtained even more favorable terms than provided in the Settlement Agreement, but it obviously doubted the likelihood of that result, else it would not have settled.[8] And an unsuccessful arbitration would have meant that it would not be given a second chance. In short, the agreement between Canton and GM was obviously a release of a claim or dispute, as described by § 627. *See generally Edwards v. Kia Motors of Am., Inc.*, 554 F.3d 943, 945-949 (11th Cir. 2009)(upholding release agreement after Alabama Supreme Court held that voluntary releases are excepted from franchise act); *Edwards v. Kia Motors of Am., Inc.*, 486 F.3d 1229, 1234-35 (11th Cir. 2007)(distinguishing franchise laws that except releases from those that do not); *Sportique Motors, Ltd. v. Jaguar Cars, Inc.*, 195 F. Supp. 2d 390, 395-98 (E.D.N.Y. 2002)(upholding release agreement as voluntary, not required) *aff'd*, 55 Fed. App'x 580 (2d Cir. 2003);

---

[8]   The timing of these events appears unfortunate for Canton. Had Shottenkirk come along prior to the settlement of the arbitration, its willingness to purchase the property might have made an arbitration a more appealing prospect for Canton.

AO 72A
(Rev.8/82)

*Hyman v. Ford Motor Co.*, 142 F. Supp. 2d 735, 746 (D.S.C. 2001) (upholding release as voluntary, not required).

Nor does the subsequent language in § 627 change the analysis. To wit, additional language in the same sentence as that quoted above provides that a release is also permissible when "separate and adequate consideration is offered and accepted, provided that the renewal of a franchise shall not by itself constitute separate and adequate consideration." *See* O.C.G.A. § 10-1-627. The Court concludes that the Settlement Agreement also satisfied this prong of the section. That is, in addition to settling its § 747 arbitration dispute with GM, the Settlement Agreement also provided that GM would award Canton a $10,000 credit to its account. The latter constitutes consideration separate from renewal of the franchise. ((Filed Under Seal) Unredacted Compl., Case No. 1994, [11] at ¶¶ 2, 5.)

Yet, even if the Settlement Agreement only constituted a release under the first prong of the section--that is, a resolution of a pending claim or dispute--the failure to satisfy this second prong concerning "separate and adequate consideration" does not change the conclusion that the Settlement Agreement constituted a valid release under § 627. Under a plain reading of the statute, a release agreement signed by a dealer is valid when <u>either</u> (1) it resolves a dispute or claim <u>or</u> (2) when consideration separate from renewal of the franchise supports it. In short, even if Shottenkirk were right

26

in arguing that Georgia law applies here, Georgia law requires enforcement of the settlement agreement, at least insofar as the Georgia motor vehicle statute is concerned.

Nor is much discussion necessary to resolve Shottenkirk's argument that, even if Canton settled away its rights under the Georgia motor vehicle statute, Shottenkirk is not subject to that settlement agreement because Shottenkirk never signed it. Not being bound by the Settlement Agreement, Shottenkirk further argues, and being a "person" who has been injured by GM's violation of the statute[9] (through GM's refusal to allow a transfer to a qualified dealer, such as Shottenkirk), Shottenkirk claims that it may therefore prevail on its claim of a violation of § 653.

The Court disagrees. As Shottenkirk, and its interest in purchasing the dealership, were not at issue during the arbitration proceeding concerning GM's intention to wind down Canton, it was understandably not referenced in the release agreement between GM and Canton resolving that pending arbitration. For that reason, it would have been impossible for Shottenkirk to sign onto that release. Nor could Shottenkirk have prevented Canton from signing the release, as

---

[9]   *See* O.C.G.A. § 10-1-623(a)("[*A]ny person who is* or may be *injured by a violation of a provision of this article* relating to that franchise . . . may bring an action in any court of competent jurisdiction for damages and equitable relief including injunctive relief.")(emphasis added).

Shottenkirk was not a party to the arbitration proceeding. Indeed, it appears that, at the time of the arbitration proceeding, Shottenkirk was not even in talks with Canton to purchase the latter's dealership.

More fundamentally, Canton could only sell that which it owned. And if it were subject to a prior agreement giving GM the option to purchase its assets should Canton not meet specified performance goals, then there was no available asset for that buyer, Shottenkirk, to purchase once Canton had failed to meet those performance requirements. *Cf. Viola E. Buford Family Ltd. P'ship v. Britt*, 283 Ga. App. 676, 677 (2007)(declining to grant specific performance of land sale contract because sellers did not have authorization to convey the property); *Chastain v. Schomburg*, 258 Ga. 218, 218 (1988)(stating that specific performance is only available to the extent that the seller has an interest in the property); and *Jolles v. Holiday Builders, Inc.*, 222 Ga. 358, 360 (1966)("A court of equity can not (sic) decree the specific performance of a contract wherein the purported vendor agrees to sell land which belongs to another.").

### D.  Canton And Shottenkirk's Equitable Defenses

Both Canton and Shottenkirk argue that, for equitable reasons, GM should not be allowed to enforce the Settlement Agreement. For the most part, they argue that some of GM's employees had, during their negotiation process on the purchase agreement, given the

28

impression that GM would likely permit Shottenkirk to purchase the dealership. This argument is unpersuasive, however, as the Settlement Agreement makes it clear that Canton could not rely on any non-written representations by GM and that GM was under no obligation to review or approve proposed transfers.[10] *See S. Bus. Machs. of Savannah, Inc. v. Nw. Fin. Leasing, Inc.*, 194 Ga. App. 253, 256 (1990)(finding performance of actions permitted under contract not to be a breach of the duty of good faith). Indeed, in addition to that agreement, the owner of Canton, when meeting with GM employees on August 26, 2011 to discuss transferring the franchise, signed a letter stating that he could not rely upon any oral representations made by GM. (Weaver Decl. [57] at Ex. A.)

In short, Canton and Shottenkirk's equitable defenses are unpersuasive.

### E.   The Impact of Michigan Law On Interpretation of the Settlement Agreement

Perhaps it is not necessary to discuss Michigan law, as Shottenkirk has implicitly conceded that if it does not prevail under Georgia law, it likewise cannot prevail under Michigan law.

---

[10]   The Settlement Agreement states that "GM shall not be required to accept, review or approve any proposed transfer . . . of the dealership business or its principal assets to any Person" and that "[n]o individual will be authorized to orally waive, modify, amend, or expand this Agreement." (Unredacted Compl., Case No. 1994, [11] at Ex. 3, ¶¶ 6, 25.)

Moreover, GM, the party purportedly relying on Michigan law, never even bothers to identify for the Court what that law might be. Yet, as the Settlement Agreement specifies that Michigan law should govern interpretation of the agreement, it would seem that some attention should be paid to that law. For this reason, the Court has again expended its own time to briefly examine Michigan law for the purpose of determining whether the latter's general principles of contract construction might arguably bar enforcement of the Settlement Agreement. That review indicates that it would not.

First, general principles of contract construction appear to be the same in both Michigan and Georgia, including the law regarding the validity of settlement agreements. *Compare* O.C.G.A. § 13-3-1 (1933) and *Mountain Aire Realty, Inc. v. Birdie White Enters., Inc.*, 265 Ga. App. 366, 368 (2004)(describing the procedure for contract interpretation) *with Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 417 (6th Cir. 2011)(describing the general principles for contract in Michigan) and *In re Smith Trust v. Homer*, 480 Mich. 19, 24 (2008)(describing the principles of contract interpretation under Michigan law); *see Ruskin*, 284 Ga. App. at 51-52 (discussing the enforceability of settlement agreements) and *Stefanac v. Cranbrook Educ. Cmty.*, 435 Mich. 155, 163-64 (1990)("It is a well-settled principle of Michigan law that settlement agreements are binding until rescinded for cause.").

30

As to Michigan's own motor vehicle franchise statute, the Court has given it a cursory review.   That review indicates that this statute explicitly provides that it has no application to dealers who are located outside the State of Michigan.   MICH. COMP. LAWS ANN. § 445.1582 (1981).   And even if Michigan's motor vehicle franchise law *did* apply to the present dispute, it only prohibits motor vehicle manufacturers from requiring dealers to assent to *prospective* releases; the limitation does not apply to releases that settle active disputes, as did the Settlement Agreement here.   *See* MICH. COMP. LAWS ANN. § 445.1573(h)(2010).

At any rate, to the extent that a specific Michigan statute might preclude enforcement of the Settlement Agreement, the Court would have been receptive to such an argument.   Yet, Shottenkirk and Canton have utterly failed to develop that argument in their briefing.[11]

---

[11]   In an isolated reference, Shottenkirk does assert that even if Michigan law applied, it would support Shottenkirk's position in this case that the Georgia motor vehicle statute at issue applied. (*See* Resp., Case No. 2201, [49] at 7 n.4 (citing Chrysler Group LLC v. South Holland Dodge, Inc., 862 F. Supp. 2d 661, 666 (E.D. Mich. 2012)).   In that case, plaintiff dealerships had succeeded in § 747 arbitration to the extent that the arbitrator directed the manufacturer to issue a letter of intent to offer them a franchise. Yet, following the arbitration, the manufacturer refused to violate the applicable Michigan dealership franchise law that protected the rights of competing dealers when awarding franchises in their area. The district court concluded that the § 747 arbitration did not preempt the Michigan motor vehicle franchise law and ruled against the plaintiff dealers and for the manufacturer.

31

In short, the Settlement Agreement between GM and Canton is enforceable.  That agreement gives GM the right to reject Canton's request to transfer its dealership to another.  It has rejected that proposal and, accordingly, Shottenkirk may not require GM to allow Canton to sell its dealership to Shottenkirk.[12]  Thus, GM's motion for summary judgment [48] as to its claims asserting a breach of contract by Canton and requesting equitable relief to require Canton to comply with the Settlement Agreement is **GRANTED.**  For the same reason, Shottenkirk's Motion for Summary Judgment [51] in its favor as to these same claims, including its Georgia state law claims, is **DENIED.**[13]

---

Other than the above case citation, neither Shottenkirk nor Canton have identified what part of the Michigan motor vehicle statute was violated by GM's conduct.  Without some citation to a particular law and an explanation of how that law would negate the Settlement Agreement that Canton entered into with GM, Shottenkirk cannot get very far with an argument that Michigan law would not recognize the release agreement.

[12]  That said, the Court suspects that, as Shottenkirk and Canton argue, this is an unfortunate result for the Canton community, where the Canton dealership had been in business for sixty-seven years.  Further, that Shottenkirk, a successful GM dealer, was willing to spend over three million dollars to purchase the dealership and give it a go, confirms that there is a decent possibility that the dealership could succeed under new ownership.  Nevertheless, under the Settlement Agreement, GM was entitled to reject any effort by Canton to sell the dealership, even if that decision may appear to be arbitrary.

[13]  As part of its complaint, GM has asked for an injunction directing Canton to comply with the contract.  After consultation with Canton, GM may submit a proposed injunction to the Court.

32

### III.  GM'S TORTIOUS INTERFERENCE CLAIMS

GM has also filed claims against Shottenkirk alleging that the latter tortiously interfered with GM's contractual and business relationship with Canton.  Shottenkirk asks for summary judgment as to those claims.  Shottenkirk has made it part of its defense to this counterclaim that it was unaware of the Settlement Agreement when it entered into the Asset Purchase Agreement with Canton.  GM seeks discovery to determine whether the latter is accurate.  (Def. GM's Resp. to Pl. Shottenkirk's Mot. for Summ. J., Case No. 2201, [61] at 21 n.6.)

To the extent that this potential factual dispute may affect a determination on this claim, the Court **DENIES without prejudice** Shottenkirk's motion for summary judgment on these claims.  Further, citing only general boilerplate principles, neither party has adequately briefed the law as to tortious interference or explained how that law should apply in this unusual factual scenario.  Any future motion for summary judgment, or response, should do so.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** GM's Motion for Summary Judgment [48] and **DENIES** Shottenkirk's Motion for Summary Judgment [51].  The parties shall present a proposed discovery schedule as to GM's remaining claims against Shottenkirk for tortious interference, by **MARCH 31, 2014.**

33

SO ORDERED, this 6th day of MARCH, 2014.


/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

34